**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-00358-BAH** |
| **HOWARD B. ADAMS,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Howard B. Adams to 12 months and a day of incarceration, which is approximately in the middle of the advisory Guideline range, three years' supervised release, $2,000 in restitution, a $900 fine, and a $100 special assessment.

## I.      INTRODUCTION

The defendant, Howard B. Adams, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Adams stormed multiple police lines across the East Plaza, through the Rotunda doors, and through Statuary Hall. Adams screamed and waved an adulterated American flag throughout the Capitol building. He attempted to gain access to the House Chamber, and when that proved unsuccessful, he entered the Rotunda to confront police officers who were attempting to re-secure the building. Rather than leave the area, he walked directly at the police line, forcing the officers to physically push Adams out of the Rotunda. Adams spent approximately 49 minutes inside the Capitol building.

The government recommends that the Court sentence Adams to 12 months and a day incarceration, the midpoint of the advisory Guidelines' range of 8 to 14 months, to reflect the gravity of Adams's conduct and the need for both general and specific deterrence.

## II.      FACTUAL BACKGROUND

### A.       The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, Dkt. No. 59, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.       Adams's Role in the January 6, 2021 Attack on the Capitol

*Approach to the Capitol*

Adams was an active participant in the January 6 attack on the Capitol. His crimes are well-documented through a series of videos provided to the FBI, body worn cameras from the Metropolitan Police Department, open-source video, and surveillance video from inside the Capitol.

Adams traveled to Washington, D.C. from his home in Florida to attend the January 6 rally at the Ellipse. After the rally, Adams approached the Capitol from the east side of the building.

Along with other rioters, he encountered a police line and bike racks. Exhibit 1 shows the police line and bike racks intact. By :30, the rioters have broken through the bike racks. Shortly thereafter, the rioters broke through the police line. Adams was at the front of the rioters who charged across the East Plaza toward the steps to the Rotunda Doors. As he charged, he waved a United States flag that had been adulterated to include the image of a snake, as seen below.



*Image 1; Screenshot from Exhibit 1 at :50.*

Police officers formed another police line at the base of the Rotunda stairs behind a chain rope.

3



*Image 2; screenshot from Exhibit 1 at 1:47.*

Adams and the other rioters quickly moved past the chain rope and forced the officers to retreat up the steps toward the East Rotunda Doors.



*Image 3; screenshot from Exhibit 1 at 5:47.*

4

At the top of the steps, officers attempted to block the doors from rioters. This was their last stand to prevent Adams and others from getting inside the building.



*Image 4; screenshot from Exhibit 1 at 9:10.*

Adams watched the last stand gleefully.



*Image 5; screenshot from Exhibit 1 at 10:01.*

5

Adams then pushed his way to the front of the mob, as officers and rioters fought around him.



*Images 6 and 7; screenshots from Exhibits 2 at 1:04 and 3 at :42.*

Exhibit 14 (attached to this memorandum) is a map of the second floor of the Capitol building. In the above screenshots, Adams was standing at location A in Exhibit 14.

6

At approximately 2:26 pm, the doorway was breached by rioters already inside the Capitol building. Because of his proximity to the doors, Adams was the seventh rioter through the Rotunda doors. He squeezed through the open door and ran past a police officer (circled in red below).



*Image 8; screenshot from Exhibit 4 at :20.*

As Adams entered the Capitol, he screamed a victory cheer and waved his adulterated American flag. He moved from location A to location B in Exhibit 14.



*Image 9; screenshot from Exhibit 5 at :01. Note: the "1:33 PM" caption is incorrect.*

7

Adams immediately continued west into the Rotunda, moving from location B to location C in Exhibit 14. He spent approximately 30 seconds in the Rotunda and then turned south toward Statuary Hall. Adams spent approximately 40 seconds walking through Statuary Hall south toward the connector to the House chamber. Adams quickly moved from location C, through location D, to location E in Exhibit 14.

At 2:28 pm, Adams and other rioters flooded into the Statuary Hall connector, where they encountered another police line. This was at location E in Exhibit 14. Once inside the connector, Adams washed tear gas from his eyes and then moved forward, towards the front of the rioters confronting police. Adams is circled in yellow below, stopped at yet another police line.



*Image 10; screenshot from Exhibit 6 at :27.*

At 2:35pm, Adams and the other rioters pushed through the police line and continued south toward the House chamber doorway.



*Image 11; screenshot from Exhibit 6 at 7:55.*

Within 30 seconds, Adams and the other rioters reached the House chamber doorway.



*Image 12; screenshot from Exhibit 13 at 6:25.*

9

In the above screenshot from Exhibit 13, Adams is at location F in Exhibit 14. The rioters were unable to gain access to the House chamber doors. Part of the crowd moved east, but Adams stayed outside the House chamber doors.

At 2:51pm, Adams was still outside the doors to the House Chamber. There, officers repeatedly told Adams to back away from the doorway and Adams repeatedly ignored them. Adams is circled in yellow below, and police officers' hands are circled in red. The officers were telling Adams to back away from the doorway.



*Image 12; screenshot from Exhibit 7 at :20.*

After more than two minutes, Adams walked north, back to the Rotunda. He moved from location F to location C in Exhibit 14.

At 2:55 p.m., Adams re-entered the Rotunda from the south. He spent approximately three minutes in the Rotunda, during which time he was waving his flag, talking on a cell phone, and talking to other rioters. Adams then exited east toward the Rotunda doors at 2:58 p.m. In Exhibit 14, he moved from location C to location B.

At location B, Adams watched rioters leaving through the Rotunda doors, where Adams first unlawfully entered the Capitol building. Instead of joining the rioters leaving the building, Adams chose instead to re-enter the Rotunda.



*Images 13 and 14; screenshots from Exhibit 8 at 1:41 and 2:47.*

11

Adams re-entered the Rotunda at 3:00 p.m. At 3:02 p.m., Adams was talking to a police officer as dozens of other officers filled the Rotunda and formed a police line along the perimeter. Adams continued taking pictures and talking on his phone as the police formed a line along the west side of the Rotunda, seen below on the right side of the screenshot. At 3:04 p.m., police officers began pushing rioters from west to east[2] toward the Rotunda doors. Adams watched the police officers and rioters pushing and shoving each other. At 3:06 p.m., after watching the police officers and rioters push and shove each other, Adams raised his arms and flag over his head and stood still.



*Image 15; screenshot from Exhibit 9 at 5:14.*

---

[2] Exhibit 9 is from a camera on the north side of the Rotunda, facing south.   The officers pushed rioters from the right side toward the left side, which was from the west side of the Rotunda to the east side, toward the Rotunda doors.

One minute later, the police officers had not reached Adams. Impatient, Adams began walking directly toward the police line.



*Images 16 and 17; screenshots from Exhibit 9 at 6:17 and 8 at 11:09.*

At 3:08pm, Adams collided with the police line pushing the rioters toward the exit. Adams and other rioters physically resisted, attempting to stay in their positions in the Rotunda.



*Images 18 and 19; screenshots from Exhibit 9 at 7:25 and 8 at 11:54.*

As a result of his efforts to resist, Adams made physical contact with at least one police officer who was trying to get him and the other rioters out of the Rotunda. In the screenshot below, an officer is pushing Adams underneath his raised arm.



*Image 20; screenshot from Exhibit 10 at 1:30.*

After Adams was pushed and sprayed, he walked toward the east side of the Rotunda and sat down to collect himself, away from the officers. Adams then exited the Rotunda at 3:09 p.m. At 3:15 p.m., he finally left the Capitol building through the Rotunda doors, the same doorway that he had forced his way through when he unlawfully entered the building.

***Defendant's Statements***

On January 22, 2021, Adams agreed to a voluntary interview with the FBI at his home in Florida. During the interview, Adams minimized his conduct.

When the FBI showed Adams a picture of him unlawfully entering through the Rotunda doors, Image 9 above, Adams pretended he did not recognize himself, asking "Who is that?"

Shortly thereafter, Adams admitted it was him and that he had gone inside the Capitol. When the FBI asked him "were the doors [to the Capitol building] already opened," Adams responded, "When I got up there, yeah."   Exhibit 11 at 12:23-44. In fact, when Adams reached the Rotunda doors, they were closed, and remained closed for several minutes thereafter.

Adams also falsely claimed that, after entering the Capitol building, he followed police officer directions through the Capitol building until he arrived in the Rotunda. Exhibit 11 at 16:30–17:00. He then described how "a line of police with . . . yellow vests on come in" and he was "just standing there" and "bam!" was sprayed. Exhibit 11 at 18:45–19:50. This conveniently omits the fact that he intentionally walked into the police line after watching them enter the Rotunda and begin pushing rioters in the opposite direction.

During the January 22 interview, Adams admitted that he had taken pictures and video while in the Capitol but that he had deleted them from his phone.

Since January 6, 2021, his wife set up a GiveSendGo webpage designed to raise money for her and Adams in light of his pretrial detention.   *See* Exhibit 12; PSR ¶ 81.   The website has not been updated to reflect that Adams has been released from custody and can resume working with his wife.   To date, the website has raised $900 for Adams, whom the website describes as a "J-6 Patriot."

## III.   THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned a superseding indictment charging Adams with obstructing, impeding, or interfering with a law enforcement officer, in violation of 18 U.S.C. § 231(a)(3) (Count One); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Two); entering and remaining in a restricted building or grounds, in violation

of 18 U.S.C. § 1752(a)(1) (Count Three); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Four); disorderly conduct on grounds or in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six). On January 26, 2023, Adams was convicted on Count One, based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Adams now faces sentencing on a violation of 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Adams faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the PSR's calculation of the applicable offense level, which is also consistent with what the parties agreed to in the plea agreement. That Guidelines analysis follows:

Count One: 18 U.S.C. § 231(a)(3)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | The offense involved physical contact | | +3 |
| | | **Total** | **13** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | | <u>-2</u> |
| **Total Adjusted Offense Level:** | | | **11** |

*See* Plea Agreement at 2–3 (Dkt. No. 58); PSR ¶ 45.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 48. Accordingly, based on the agreed-upon calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 11, Adams's Guidelines imprisonment range is 8 to 14 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a significant term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Adams's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Adams's offense were of the utmost seriousness, and fully support the government's recommended sentence of 12 months and a day.

### B.  The History and Characteristics of the Defendant

Adams's history is unremarkable. He grew up in a rural neighborhood in Georgia, where he lived with his parents and brother, and never experienced or witnessed any abuse. PSR ¶¶ 53–57. Adams and his wife own a successful caulking business, and he owns multiple properties and vehicles. *Id.* ¶¶ 60, 79–80. He has no criminal convictions and only minor traffic infractions. *Id.* ¶¶ 46–50. Nothing about Adams's history mitigates his overwhelmingly willful conduct on January 6, 2021.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Adams's criminal conduct, placing himself at the front of a mob and breaking through multiple police lines outside and inside the Capitol building, was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol that took place on January 6, 2021.

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a significant term of incarceration.

First, Adams intentional falsehoods to the FBI demonstrate a lack of remorse and a disrespect for law enforcement. Second, Adams failed to appear in court on November 10 and 17, 2022, and was detained by the court. Third, Adams benefits from a GiveSendGo page created by his wife to raise money for Adams in light of his pre-trial detention, which characterizes Adams as a "J-6 Patriot," demonstrating a lack of remorse.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases involving violations of 18 U.S.C. § 231(a)(3) provide suitable comparisons to the relevant sentencing considerations in this case.

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Nolan Cooke*, 22-cr-52 (RCL), Cooke was one of the first rioters to breach the bike rack barriers on the east side of the Capitol. He physically pushed past officers, encouraged others to force their way into the building, and used his flagpole to strike at a window of the Capitol. Like Adams, Cooke engaged in direct physical contact with law enforcement, and faced a range of 8 to 14 months' imprisonment. The court sentenced Cooke to 12 months and a day of incarceration, and 36 months' supervised release.

In *United States v. Ronnie Presley*, 21-cr-257 (RDM), the defendant forcibly entered the U.S. Capitol and entered the Rotunda, where he stayed for approximately 20 minutes and resisted officers who were trying to remove him. Though Pressley was inside the Capitol for less time than Adams, he faced a slightly higher sentencing range of 10 to 16 months due to his criminal history. The court sentenced Presley to 12 months' incarceration and 26 months of supervised release.

In *United States v. Moises Romero*, 21-cr-677 (TSC), the defendant entered the Capitol building through the Senate Wing Door and grabbed the corner of a police officer's riot shield. Unlike Adams, Romero left the building soon after entering, and had no further confrontations with police. Romero faced a guideline range of 8 to 14 months' imprisonment. The court sentenced Romero to 12 months and a day of incarceration, and 12 months of supervised release.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[6] *United States v. Papagno*, 639

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. §

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Adams must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Adams played in the riot on January 6.[7] Plea Agreement at 8. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Adams's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 107.

## VIII.    FINE

Adams's conviction under Section 231 subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning

---

3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. Here, the guidelines recommend a fine from $4,000 to $40,000. PSR ¶ 105. The government requests a fine of $900. As the PSR notes, Adams has raised $900 in an online campaign styled as "Support for J-6 Patriot Howard Adams." *Id.* ¶ 81. The website indicates the funds are to go to his wife and be used to cover "the loss of his income with no end in site [sic]." Adams should not be able to "capitalize" on his participation in the Capitol breach in this way.

## IX.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 12 months and day of incarceration, three years' supervised release, $2,000 restitution, $900 fine, and $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Michael L. Jones*
MICHAEL L. JONES
DC Bar No. 1047027
Trial Attorney
Capitol Riot Detailee
601 D St. NW
Washington, DC 20530
(202) 252-7820
michael.jones@usdoj.gov

Michael C. Liebman
Assistant U.S. Attorney