UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

HOWARD B. ADAMS

CRIMINAL ACTION

NO. 1:21-CR-00358-01 (BAH)

**DEFENDANT'S SENTENCING MEMORANDUM**

NOW COMES Defendant HOWARD B. ADAMS, and files this Memorandum to assist this Court in its sentencing evaluation. Consistent with the Probation Office's recommendation, the defense submits a fair sentence would involve no more than two years of probation (or a similar term of supervised release), $2000 restitution, a modest fine and the special assessment.

**BACKGROUND**

Mr. Adams entered a guilty plea in this case to Count One, charging him with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), arising from his activities on January 6, 2021. That statute, a Class D felony, allows for a maximum prison sentence of up to 5 years of incarceration, but also allows for a convicted party to receive a term of probation.

**INTRODUCTION**

The Government has recommended a sentence of incarceration of 1 year and one day, $2000 restitution, an $800 fine, and a $100 special assessment. The U.S. Probation Office, by contrast, recommends a sentence of 2 years of probation, $2000 restitution, a $2000 fine, and a $100 special assessment. The Probation Office's recommendation, on balance, is more balanced. That office, like the prosecutors, similarly calculated Mr. Adams' guideline range, and similarly compared his January 6 activities to the hundreds of other defendants charged for their activities that day – but also, unlike the Government, also considered Mr. Adams' larger life over some 62

years, and his commendable life experiences that strongly mitigate against further imprisonment in this case. Accordingly, the Probation Office's balanced recommendation should be adopted.

## FACTUAL BACKGROUND

### A. Mr. Adams's Activities Are Not as Aggravating as the Government Suggests

The Defendant does not deny that he actively participated in the events of January 6, 2021. It is true that he did occasionally move toward the front of activities. Caught up in the moment, he also did cheer on certain activities taking place. But what he did not do is ever engage in any fighting, despite opportunities to do so. *Compare* ECF #66 at 6 (describing how "rioters fought around him"). He was never charged with, and never engaged in, any assaultive or physical violence himself; during his 49 minutes inside, he neither caused any injuries nor any property damage. The Government does claim that Mr. Adams "made physical contact with at least one police officer," ECF #66, at 15 – which Mr. Adams does not deny, and which may well explain why he was charged with a felony offense rather than a misdemeanor – but that physical contact did not involve any assault. Instead, as the Government concedes, it occurred after Mr. Adams had moved toward the front and then "collided with the officers pushing the rioters toward the exit." ECF#66 at 14. In other words, it arose from an "attempt[] to stay in their positions in the Rotunda" rather than any affirmative attack on any officer. *Id. See also id.* at 12 ("Adams raised his arms and flag over his head and stood still"). By the Government's admission, this physical contact may even have been initiated by the officers. *Id.* at 15 (screenshot shows "an officer is pushing Adams" rather than vice versa). And shortly after that physical interaction, Mr. Adams voluntarily exited both the Rotunda and the U.S. Capitol. *Id.*

The Government also criticizes Mr. Adams' later interview – which he had agreed to submit to voluntarily – claiming he "minimized his January 6 conduct. *Id.* But the description

here sounds like a mere "exculpatory no" statement, being made in the absence of any defense counsel; the Government further concedes that "[s]hortly thereafter," Mr. Adams "admitted it was him." The remaining so-called discrepancies may well be due to interpretive ambiguities in the Q&A.[1] In any event, the Government has *never* suggested that Mr. Adams' interview was somehow so evasive that it would rise to the level of justifying obstruction of justice under U.S.S.G. § 3B1.1. In reality, most of this interview involved *inculpatory admissions*, allowing the Government to quickly confirm his January 6, 2021 presence, and charge him by early 2021.

The GiveSendGo webpage the Government criticizes – by its own admission – was set up by Mr. Adams' wife, not by Mr. Adams. *See also* ECF #66-1 (confirming "Campaign Created by: Lisa Adams"). It apparently was created due to financial hardships she was experiencing after Mr. Adams was incarcerated this Fall and could not work. It also was created at a time before undersigned counsel had been appointed, and the Government apparently concedes it has essentially been dormant (with no attempts at updating or soliciting more funds) ever since.

**B. Mr. Adams' 62 Years Reveal a Man Who Does Not Need More Incarceration**

Mr. Adams' overall life is summarized in considerable detail in his Presentence Report. While it does not show a perfect life, it does reveal a man who has genuinely tried his best and has worked very hard to build a decent life and be an honorable person and good neighbor.

Mr. Adams was born in Georgia in 1960. His parents have both since passed away, but Mr. Adams remains close to his brother, who describes him as "easy going and good hearted" and pleads for this Court's leniency. PSR ¶ 54a.

[1] The Government complains because the FBI, when asking him about entering the Capitol, asked him "were the doors already opened," to which Mr. Adams said, "When I got up there, yeah." Mr. Adams *did not* say "as soon as I got up there, yeah," yet the Government tries to suggest that he did. *Id.* at 16. Similarly, Mr. Adams described how he had been pepper sprayed by a police line while in the Rotunda. Which is true. While the Government complains this "conveniently omits" that he had previously walked toward the police line, *id.*, he was never asked about that.

Mr. Adams has been married to his current wife, Lisa Adams, since 2008. They have lived in the same home since 2012. They also jointly own and (when Mr. Adams is released) operate a business, High Rise Caulking, LLC.[2] She describes their current marriage as the "healthiest relationship" she has ever had, and she too pleads this Court for leniency. PSR ¶ 60. *See also* Exhibit A (character letter of Lisa Adams). Mr. Adams also has a grown son from a previous marriage, who had struggled with Oxycodone, but is now sober three years. PSR ¶ 58.

Mr. Adams has never been on disability and has not been receiving Government financial support; instead, he has steadily worked at various jobs almost his entire life. Around 2002, he moved to Florida to start a skydiving instruction business, but it ultimately went defunct. PSR ¶ 76b. He later attempted to go into real estate, PSR ¶ 76a, before starting High Rise Caulking, LLC, which specializes in leak repair on high-rise buildings, often 20-30 stories high. He has now (with his wife) run that business out of his home for over 20 years. PSR ¶ 75. While their wealth has been depleted by this case, they earned a stable income and accumulated some assets.

Mr. Adams had previously been diagnosed as having Attention Deficit Disorder (ADD), PSR ¶ 66, which also interfered with his ability to get a college degree. PSR ¶ 70. During this case, prior retained counsel referred Mr. Adams for a psychological evaluation. That evaluation (Exhibit B, filed under seal), indicates Mr. Adams' participation on January 6 may have been due in part to a strong desire for group identity, described as "deindividuation." No thought disorder, delusional material or psychopathology (disorder or condition) was indicated. The report concludes that Mr. Adams presents an "extremely low risk for future violence." PSR ¶ 66a-b.

Mr. Adams is well regarded by friends and neighbors, several of whom have been pleased to submit good character letters on his behalf. They are attached; key excerpts follow:

[2] Because High Rise Caulking performs contract work on high-rise buildings, Mrs. Adams could not continue that work when Mr. Adams was incarcerated; during that time, she worked for a home health agency. PSR ¶ 60.

Darrell R. Perkins of Greenwich, CT describes how he had met Mr. Adams 20 years ago through his Uncle Tom, who lives in Florida. Perkins notes how the Adams had begun noticing signs that Uncle Tom was no longer able to manage his finances and bills, and had called to see if they could help. "Since that day, we have been in almost weekly contact…. They selflessly assist my uncle whenever he needs a hand." *See* Exhibit C.

> When I flew down to Florida in early fall of 2019, they were instrumental in helping me obtain power of attorney for Tom, reviewing what needed to be done on a weekly and monthly basis, and giving me peace of mind that they would be there to help. Howard does none of this for personal gain. He does it because he is innately a good person who always does the right thing.

*See also id.* ("Howard is the type of person that my family always referred to as 'good people.' He is always he first to lend a hand and neither expects nor wants anything in return.").

Kenneth L. Jernigan, who has known Mr. Adams for 16 years, describes him as "an honest God-fearing man of excellent quality and character." *See* Exhibit D.

Peter J. Gilfoil, who has known Mr. Adams for nearly 11 years through recreation groups involved in kayaking, bicycling and camping, describes him as "a person of honesty and integrity. He certainly is one of he most charitable people I know, toward others. He is exactly the kind of person one would like to have as a neighbor." *See* Exhibit E. He then notes:

> After seeing Howard recently, I can tell you that he is mortified about the mistake he made in entering the Capitol building. Based on knowing his character, I believe, as he has stated, his actions on that day were based on impulse, as opposed to any planning to enter the building.

Donna Grizzle, Mr. Adams' ex-wife and the mother of his grown son, also submitted a letter. She described Mr. Adams as being "kind, honest and most of all spiritual," and also says "Howard has been he biggest spiritual influence in my life." *See* Exhibit F. *See also id.*

("Howard is a very humble, spiritual man. He is honest, trustworthy, loving and [would] never do anything to hurt anyone."); *id.* ("I have nothing but kind words to say about Howard.").

Rev. Robert F. Smith notes that he has been a neighbor of Mr. Adams for seven years. He notes how "I personally witnessed situations in which Howard acted as a peacemaker and defused tense and angry situations here. I have never seen him raise his voice in anger or confront someone else in an aggressive manner." *See* Exhibit G. *See also id.* ("He has never expressed prejudice against anyone.").

Roland and Sharon Hosier note how they have known the Adams since 2007-08, when they joined a kayaking club. Howard Adams is described not only as a successful entrepreneur but also someone who "always showed compassion for his fellow man and was always helping others whenever needed." *See* Exhibit H. They describe as an example the Adams'

> unwavering loyalty to one of our fellow kayaker friends who has been dealing with early onset dementia. For well over a year now, they have been the primary caregivers to permit him to remain independent with their help. They have helped maintain his home, made sure he had meals and traced down his out of area family to further support him.

*Id.* *See also id.* ("We do not use the term 'Friend' for many. We have many acquaintences but we reserve 'Friend' for very few. A friend is someone you can count on in thick and thin. A friend is always there for you. A friend is someone who will pray for you and care for you no matter what. We are proud to say that Howard and Lisa are the very best of friends and epitomize the word 'Friend.'").

Alan Murphy has a relationship with Mr. Adams that "goes back approximately 30 or more years." *See* Exhibit I. Communications waxed and waned, but "there was always a certainty that we could call on him at any time when there was a need." He noted as follows:

> In October 2018, after our hometown was devastated by Hurricane Michael, and we lost communication with the outside world, Howard and another friend showed up at our house with all the tools needed to help us repair and clean up damages. They stayed about two weeks, and also helped many others in that time, including family members, friends, and strangers. They would no accept any compensation from anyone in any way.

*Id. See also id.* ("Howard is truly one of the most decent and respectable people we know").

Mrs. Donna Bryant notes how she has known Mr. Adams for about 8 years, and "when my husband was here in hospic[e], he was always ready to help me any way he could." *See* Exhibit J. Since "the passing of my husband," Mrs. Bryant says Mr. Adams has continued to help her around the house, and in "all the years I have known him and been around him I have never heard him say a curse word, he is a kind, considered it [sic] man." *Id.*

Jennifer M. Geiger, Mr. Adams' banker, describes him as "the most laid back easy going man I know, and says she considers him "a good upstanding man." *See* Exhibit K.

Peggy Rice has known Mr. Adams for over 20 years, and Trish Rice has known him for over 5 years. Both have worked for the Oceans Two Condominium Association, a high-rise 108-unit condominium. Both describe his strong work ethic, honesty and professionalism during a longstanding working arrangement. *See* Exhibits L & M.

Gregory and Nancy James describe Mr. Adams' solid relationship with his wife and a quiet and modest demeanor that is "simplistic, straightforward, honest and fair." *See* Exhibit N.

Finally, Mr. Adams' mother-in-law describes him as "a caring and devoted husband" who has also been "extremely kind and generous to me." She describes how he has worked on projects at her home, "not because I asked him, but because he cares." She concludes: "Everyone needs a 'Howard Adams' in their life … but you can't have mine!"

This is the man now before this Court. Despite being 62 years old, Mr. Adams has a criminal history score of zero, with no negative incidents at all in his life except for a few minor traffic infractions and a hunting citation. As a result of this case, however, he will now be a felon, with a significant attendant loss of various civil liberties as a result – including any future ability to hunt with firearms, plus the FAA's separate collateral revocation of his parachute rigger certification. PSR ¶ 71. Mr. Adams and his wife have also had to sell two of their properties because of the financial stress of the instant case. PSR ¶ 60. He has also, as the Court is well aware, already served over two months in jail in this case, after experiencing arrest and incarceration for this first time in his life, after his bail in this case was revoked, due to his brief affiliation with a "sovereign persons" sect that he has since publicly renounced. PSR ¶ 57.

## ARGUMENT AND CITATION OF AUTHORITIES

When federal courts are tasked with imposing a criminal sentence, Congress has provided a list of statutory factors they should consider. Those statutory factors include:

(a) the nature and circumstances of the offense and the history and characteristics of the defendant;

(b) the kinds of sentences available;

(c) the Sentencing Guideline range;

(d) the need to avoid unwarranted sentencing disparities;

(e) the need for restitution; and

(f) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from future crimes, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.

18 U.S.C. § 3553(a). In evaluating these various statutory factors and exercising its discretion, this Court must also recognize the overarching rationale of § 3553(a), for its ultimate directive is

that federal courts must "impose a sentence *sufficient, but not greater than necessary* to comply with the purposes" of federal sentencing. 18 U.S.C. § 3553(a) (emphasis added).

**A. Nature and Circumstances of the Offense and Characteristics of the Defendant**

As noted above, the nature and circumstances of Mr. Adams' offense (Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)) are not aggravated. His "offense" – which is what this Court is *supposed* to examine under this factor when evaluating its seriousness – was a violation of 18 U.S.C. § 231(a)(3), a Class D felony. The Government attempts to lump Mr. Adams in with some of the worst of the many others present that day, by association, but *their offenses are not his offenses.* And his personal characteristics, as noted in detail above, are worthy of careful consideration by this Court, and justify a probated sentence.

Each of us is more than the worst thing we have ever done. While Mr. Adams' activities inside the U.S. Capitol on January 6, 2021 were admittedly wrong, a probated sentence would still be a significant sanction, particularly given that he is a 62-year old with no prior record (before or since), and given that he has already tasted the sting and humiliation of incarceration. There also is no good reason to believe Mr. Adams will not comply with any new term of supervision imposed,[3] and considering the circumstances of this offense and Mr. Adams' personal characteristics, the Government has failed to meet its burden of proving imprisoning Mr. Adams for a longer period of time than he has already served is actually "necessary" here.

**B. The Kinds of Sentences Available**

Mr. Adams' offense of conviction has no minimum sentence required, and a maximum sentence of up to 5 years of incarceration. Probation is undeniably available in this case.

[3] Mr. Adams complied fully with pretrial supervision for 1½ years, from March 18, 2021 until October 1, 2022. After his re-release on January 26, 2023, he has again complied fully with all conditions of his supervision.

**C. The Sentencing Guidelines Range**

By agreement of the parties, and as found by the U.S. Probation Office, Mr. Adams has a Total Offense Level of 11, and a Criminal History score of I, yielding a Sentencing Guidelines range if 8-14 months. As Mr. Adams' Presentence Report notes, this range is in Zone B of the Sentencing Table, which means that (even if it *decides not* to depart or vary from this Guideline range), "the Court may impose probation with a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention." PSR ¶ 99. While the Government demands a sentence of incarceration here (and also a sentence that is *above* the middle of the range, despite its description), it never really explains (at all) why a within-range sentence of probation with home confinement would not be sufficient in this case.

**D. The Need to Avoid Unwarranted Sentencing Disparities**

Under this factor, this Court must evaluate if the sentence imposed on Mr. Adams would unduly diverge from sentences given to others similarly situated. To assist, the Government's Sentencing Memorandum has listed three other January 6 cases that it claims are similar, and which it then claims justify a sentence of a year and a day (of full incarceration) for Mr. Adams. In fact, none of these three cases is similar at all, as they each involve significant aggravating factors not present in Mr. Adams' case.

The first "comparable" case the Government cites is *United States v. Cooke*, Case No. 1:22-cr-52 (RCL), but it is not at all similar. Cooke "helped lead the charge of rioters who broke through the police line guarding the east side of the Capitol building," and "later bragged he was one of he first to break through the barricade." *Cooke*, ECF #52, at 2. He also "used a flagpole carrying an American flag to strike one of the Capitol windows and encouraged other rioters to 'smash the windows' and 'break the glass.'" *Id.* In fact, there were actually two attempts to

break the east Capitol police line; after the first, Cooke raised his middle finger and pointed at police officers, telling others "That was fun." *Id.* at 6-7. During the second, Cooke helped another rioter push a bike rack at the officers, encouraging other rioters to "get them [the officers]" and "get these motherfuckers." *Id.* at 10. The Government described Cooke as "directly impeding or interfering with law enforcement officers." *Id.* at 12 n.5. He then faced another line of police officers at the Capitol building, and did it again, chanting "This is a fucking revolution, dammit." *Id.* at 16. At the top of the Capitol steps, "Cooke appeared to strike a woman's head with his flagpole." *Id.* at 20. He then encouraged other rioters to get in, yelling "Get in there" and pushing against the other rioters seeking to enter. *Id.* At the top, Cooke "pushed against the officers," with "[t]he officers continu[ing] that struggle for several minutes." *Id.* at 25. Cooke later resumed calls to fellow rioters to "Bust the windows" and "Break the glass," *id.* at 28, and himself struck a window with his flagpole three times. *Id.* at 29. Cooke later bragged "he was one of the first ones to run through" the barricades, and that it was fun, and laughed when another rioter spoke of wanting to "scalp that bitch" (Nancy Pelosi). *Id.* at 31. When interviewed by the FBI, Cooke said he would "do it all over again." *Id.* at 35. The Government cited his "persistent incitement of other rioters" in its sentencing memo. *Id.* at 35. None of that exists here, yet the Government oddly recommended less (11 months) for Cooke.

The Government's second "comparable" case, *United States v. Presley*, Case No. 1:21-cr-257 (RDM) is also dissimilar. In that case, the Government's recommended 16 months was basically merely just a "time served" sentence, since the Defendant had already been detained for 17 months. And more importantly, a higher sentence was warranted there, since that Defendant was a convicted felon with several priors. Pressley had previously been convicted of burglary in 1997, of a DUI in 2001, and for domestic assault in 2005. *Presley*, ECF #52, at 23. Even worse,

Pressley had only recently been convicted of a separate charge of assault, and had even been on probation for that assault charge *when he committed his U.S. Capitol offense on January 6, 2001*. *Id.* at 2 & 6. Obviously, Pressley's case is nothing like this one. Moreover, even ignoring that criminal history (which this Court *should not*), Presley's January 6 activities also were more severe than those of Mr. Adams. Unlike Mr. Adams' single-touch situation, with Presley the Rotunda officer "had to push Presley away three times, because after each push Presley moved back to the officer." *Id.* at 12 Then a second officer "was forced to engage with Presley because he still was not moving toward the exit," to the extent that he was "pushing his baton against Presley's torso." *Id.* This officer "pushed Presley a total of seven times in 20 seconds, because, again, after each push Presley continued to move toward the officer." *Id.* at 13. Presley then "continued until a third officer engaged with him." *Id.* Presley then moved behind two other rioters pledging not to leave the room. *Id.* The third officer then had to deploy his baton to push Presley away again. *Id.* at 14. Presley was ultimately "among the last group of rioters to leave the Rotunda." *Id.* at 15. Unlike Mr. Adams, who then left the Capitol for good, Presley then circled back and tried to reenter the East Rotunda Doors, where officers struggled to prevent another breach, and Presley himself pulling on one officer's riot shield. *Id.* at 2 & 16-19. After leaving, Presley bragged to another rioter, "I'm the guy that got you in this building." *Id.* at 20.

The final government "comparable" is *United States v. Romero*, 1:21-cr-257 (RDM), but that case too is nothing like this one. Romero's confrontation with police at the Capitol appeared to be premeditated, as he even brought to the Capitol a dual cartridge respirator and eye-protection safety glasses. *Romero*, ECF #29, at 1. *See also id.* at 15 (photo of Romero wearing gas mask and protective goggles). More importantly, Romero was not merely a participant, but also a leader. *Id.* at 1. He not only "joined a group of rioters that pushed past police" in order to

occupy inauguration bleachers, but "later led a group that forcibly pushed through a makeshift police barricade at the Senate Wing Door to gain entrance to the Capitol, grabbing the edge of an officer's riot shield in the process." *Id.* at 2. Romero is seen among the rioters "pushing against police," and he joins in "push[ing] through the police line." *Id.* at 18. Later, he engages yet again, joining others in "forc[ing] their way into the Capitol by pushing the barrier out of the way and into the defending officers." *Id.* at 22. Officers resist, but "[u]ndeterred, Romero grabbed the [police riot] shield with his hand." *Id.* at 24. After breaking through this police line, it was "[l]ike a dam bursting, [with] rioters pouring through the doorway," as Romero gave a "celebratory yell." *Id.* at 26. Romero then personally entered Sen. Merkley's office, which was eventually trashed and where a laptop was later determined to have been stolen. *Id.* at 27 & n.14.

The Government emphasized that "[u]nlike many other January 6 defendants, Romero did not just walk into the Capitol. He forced his way in, first by pushing through a police line at the Lower West Terace, and later by pushing through the makeshift police barrier and the officers defending the Senate Wing Door. Nor were Romero's actions spontaneous or provoked. The fact that Romero brought eye protection and a respirator demonstrated he anticipated violence." *Id.* at 36. Moreover, "the harm caused by Romero's conduct was multiplied because his actions re-opened a major breach point, enabling a swarm of rioters to enter the building." *Id.* Romero (like Presley) had also returned to the Capitol to engage with police again, even after initially leaving, "joining yet another group of rioters trying to gain entrance to the Capitol through the Rotunda Doors." *Id.* at 2. *See also id.* at 29-30.

Despite the far more aggravated facts of Cooke and Romero, the Government in those cases oddly recommended a sentence of only 11 months – *less* then they now recommend for Mr. Adams here. The Government's recommended sentence for Mr. Adams would in no way be

proportionate to the sentences given to others in these cases. As the Government's filing in the *Presley* case made clear, there have been a number of sentences issued in 18 U.S.C. § 231 cases; almost all have involved sentences between 30 days to 9 months; most are 6 months or less. The Government's suggestion that a 12 month and 1 days sentence is "necessary" here is absurd.

**E. The Need for Restitution**

Restitution is restitution owing in this case, and Mr. Adams' plea agreement indicates that he will pay $2000 in restitution. All parties are in agreement that this amount is warranted. Mr. Adams will be better able to pay that restitution if he can return to the community and work.

**F. Other Factors Listed**

Finally, under 18 U.S.C. § 3553(a)(2), this Court must consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence; to protect the public from future crimes; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.

On this factor, the Government's Sentencing Memorandum focuses almost exclusively on the need for deterrence, ignoring the fact that, as noted in § 3553(a)(2) itself, those goals and the others listed under this factor must also be balanced with considerations of "just punishment."[4] And the Government's recommendations of "just punishment" in January 6 cases have deviated quite frequently from the imposed sanctions issued by the judges of this District.

The *Washington Post* just recently published an article on the two-year anniversary of January 6, 2021, summarizing the 357 sentences imposed in related criminal cases thus far. *See* Washington Post, January 6, 2023, https://www.washingtonpost.com/dc-md-va/2023/01/06/jan6-

[4] The Government's filing spends pages discussing "General Deterrence" and "Specific Deterrence," while its review of Mr. Adams' "History and Characteristics" covers one paragraph of less than six lines. ECF #66 at 19.

capitol-riot-sentencings/. As the article notes, the various judges of this District "have gone below federal prosecutors' sentencing recommendations in more than three-quarters of the cases so far." *Id.* p.2. There is not any presumption of incarceration here, and indeed there *cannot* be, consistent with § 3553(a)'s statutory mandate for courts to only impose a sentence "sufficient but not greater than necessary" to accomplish the purposes of sentencing.

The U.S. Probation Office, like he U.S. Attorney's Office, has carefully considered the applicable Sentencing Guidelines, and has also examined this case the larger context of the hundreds of other cases it has similarly evaluated. Its recommendation is that Mr. Adams does not *need* to go to prison here, beyond the time that he already has served. Mr. Adams' actions on January 6, 2021 do not require it, and neither does his personal background. That recommendation (and not the reflexive position of the Government to apparently recommend a Guidelines prison sentence regardless, even when the Guidelines themselves – as here, in Zone B – do not even require incarceration) should be followed by this Court. Mr. Adams has already tasted the sting of prison; he also has incurred substantial financial loss from this case and has and will incur collateral consequences that render further incarceration unneeded. The Court should impose a sentence of no more than 2 years of probation (or time served plus 2 years of supervised release), on Mr. Adams in this case, along with the required $2000 in restitution, a fine of either $800 or $2000, and a $100 special assessment.

This 27th day of March, 2023. Respectfully submitted,

/s/ Gregory S. Smith
Gregory S. Smith
D.C. Bar No. 472802
913 East Capitol Street, S.E.
Washington, D.C. 20003
(202) 460-3381
*Counsel for Defendant Howard B. Adams*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of March, 2023, a true and correct copy of the above and foregoing is being forwarded to all counsel of record in this case automatically via PACER, which is this Court's Electronic Case Filing (ECF) system.

_/s/_Gregory S. Smith________
Gregory S. Smith